## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

SOUHIL CHAGHOURI,

      Plaintiff,                           Case No.
                                                Hon.

v.

MGM RESORTS, a foreign company,
MGM RESORTS INTERNATIONAL, a foreign corporation,
MGM GRAND DETROIT, LLC, a foreign limited liability company
(DBA MGM GRAND DETROIT HOTEL AND CASINO),

      Defendants.                 **DEMAND FOR JURY TRIAL**

_____/

THOMAS R. WARNICKE (P47148)
LAW OFFICES OF THOMAS R. WARNICKE, PLLC
Attorneys for Plaintiff
30200 Telegraph Road, Suite 102
Bingham Farms, MI 48025
Office: (248) 930-4411
Cell:  (248) 410-3031
tom@warnickelaw.com

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

    There is no other civil action between these parties arising out of the same transaction or occurrence as alleged in this complaint pending in this court, nor has any such action been previously filed and dismissed or transferred after having been assigned to a judge.

Plaintiff, Souhil Chaghouri, by and through his attorneys, the Law Offices of Thomas R. Warnicke, PLLC, for his cause of action against Defendants herein, states as follows:

## JURISDICTION AND VENUE

1. Plaintiff, Souhil Chaghouri, is and has been at all relevant times hereto, a citizen and resident of the county of Oakland, state of Michigan, within the Eastern District of Michigan and the jurisdiction of this Court.

2. Upon information and belief, Defendant MGM Resorts is a foreign company, with its' corporate headquarters and nerve center located in Las Vegas, Nevada.

3. Upon information and belief, Defendant MGM Resorts International is a foreign corporation with its' corporate headquarters and nerve center located in Las Vegas, Nevada.

4. Upon information and belief, MGM Resorts International is an American Global Hospitality and Entertainment company that operates Defendant MGM Grand Detroit, LLC and Defendant DBA MGM Grand Detroit Hotel and Casino.

5.    MGM Grand Detroit, LLC ("MGM Grand Detroit") is a foreign limited liability company, organized under the laws of the state of Delaware, with its principal place of business at 1777 Third Street, Detroit, Michigan 48226.

6.    Upon information and belief, all members and/or sub-members of MGM Grand Detroit, LLC are citizens of states other than Michigan.

7.    This action arises out of the illegal and wrongful discrimination and discharge of Plaintiff from his employment with Defendants on April 14, 2023, wherein Plaintiff was terminated, in whole or in part, in violation of the Family Medical Leave Act - 29 USC 2016 et seq.; in violation of the Michigan Elliott-Larsen Civil Rights Act - MCL 37.2101 et seq. for age discrimination; and in violation of the Michigan Persons with Disabilities Civil Rights Act.   This is a civil action seeking damages and injunctive relief against Defendants for committing acts prohibited under federal and state law.

8.    With respect to the federal claims asserted herein, the Court's jurisdiction is invoked pursuant to 28 USC §§ 1331 and 1343 for the violation of Plaintiff's federal statutory rights. With respect to the state law claims asserted herein, the Court's supplemental jurisdiction is invoked pursuant to 28 USC § 1367(a).

9.     Venue is proper in this district pursuant to 28 USC § 1391(b), since the events

       giving rise to the claims occurred in this district.

## GENERAL ALLEGATIONS AND STATEMENT OF CLAIM

10.    Plaintiff repeats and reincorporates by reference the above stated paragraphs.

11.    Plaintiff is a 64-year-old male, who began his career with Defendants on or

       about September 2, 2002.

12.    Plaintiff worked for Defendants for over 20 years, all in Defendants' Detroit

       casino location(s).

13.    Plaintiff began his employment with Defendants in the position of VIP Chef

       in Detroit, Michigan.

14.    Plaintiff was then hired by Defendants into the position of Assistant Chef for

       the MGM Brown Derby Steakhouse.

15.    Approximately six months later, Plaintiff was promoted to the position of

       Executive Chef for the MGM Brown Derby Steakhouse.

16.    In or about 2007, the former MGM casino building was closed and MGM

       Casino was relocated to its current location in Detroit.

17.    In 2007, MGM closed the Brown Derby Steakhouse and Plaintiff was hired

       into Defendants' Wolfgang Puck restaurant located at its current casino

       location.

4

18.   Plaintiff was in that position for approximately two years.

19.   Due to Plaintiff's wife's medical situation, Plaintiff needed to move into a midnight position so he could care for his wife.

20.   Plaintiff then went into transferred to a midnight position for Suez Chef and midnight cafeteria.

21.   Plaintiff remained in that position until approximately 2015.

22.   In 2015, Plaintiff was requested to apply for a Slot Operation Supervisor position.

23.   Plaintiff was advised by Defendants that the reason they wanted him to apply for the position was because Plaintiff was fluent in many languages and it would be beneficial for Defendants to take care of customers that spoke different languages.

24.   Plaintiff applied for the Slot Operation Supervisor position and was hired for the position in 2015.

25.   Plaintiff worked in the Slot Operation Supervisor position until approximately 2018.

26.   In approximately 2018, Defendants decided to eliminate various employees that worked in the position of Slot Operation Supervisor.

27. Plaintiff was one of the Slot Operation Supervisors that was terminated from employment with Defendants.

28. In or about December 2018, Defendants offered Plaintiff to return to employment with Defendants in the position of Chef in the buffet.

29. Plaintiff accepted the position.

30. During this time that Plaintiff was working in the position of Chef, Plaintiff applied and interviewed for an Assistant Manager position three times.

31. On each occasion, Plaintiff was promised the position.

32. On each occasion, something unknown to Plaintiff happened and he did not receive the position.

33. In or about August of 2020, Plaintiff was terminated by Defendants from his Chef position due to the Covid-19 pandemic.

34. In or about July of 2021, Defendants offered to rehire Plaintiff into the position of Assistant Manager of Slot Operations.

35. Defendants agreed to honor Plaintiff's seniority with the company.

36. Plaintiff accepted the position of Assistant Manager of Slot Operations and started back to work.

37. When Plaintiff returned to work for Defendants in or about July 2021, he became aware that Defendants were trying to find a way to fire an employee,

with the initials of R.A., because she allegedly would frequently call off from work for intermittent FMLA leave of absences.

38.   Plaintiff became aware that Defendants' management repeatedly said that they despised when employees took off from work for FMLA leaves of absences.

39.   Plaintiff had also observed during his employment with Defendants that employees that took FMLA leave of absences were often discriminated and retaliated against.

40.   Defendants' management's desires to terminate R.A. specifically, along with their overall animus against employees taking FMLA leaves of absences, continued into May 2022.

41.   In or around late winter/early spring of 2022, Plaintiff sought an FMLA leave of absence from Defendants for Plaintiff to have a knee replacement surgery.

42.   Defendants approved Plaintiff's FMLA request for his knee surgery.

43.   Upon information and belief, Plaintiff worked up until May 16, 2022 for Defendants, which was the day before his scheduled knee surgery.

44.   Plaintiff's knee surgery took place as scheduled on May 17, 2022.

45. Plaintiff's knee surgery was going to require that Plaintiff be off work for an extended period of time and that was the reason for his FMLA leave of absence.

46. On or about May 19, 2022, a person called Plaintiff and left a voice message in which she identified herself as Ang Allen, an employee relations partner with MGM Resorts International, and that she was calling Plaintiff because she wanted to speak with him as a witness because she was currently conducting an investigation.

47. Upon information and belief, Ms. Allen was located in Las Vegas when she called Plaintiff.

48. Plaintiff was confused that he received such a call from Ms. Allen since he was on an approved FMLA leave of absence and was not supposed to be contacted until his FMLA leave expired.

49. However, Plaintiff returned Ms. Allen's voice message and asked her what the call was about.

50. Ms. Allen began to question Plaintiff about Defendants' co-worker at the Detroit MGM casino with the initials R.A.

51. Plaintiff was in a cloudy daze having just had his knee replaced two days earlier, which included being on very powerful medication.

52.   Plaintiff informed Ms. Allen that he was on an FMLA leave and on a very powerful medication prescribed by his surgeon.

53.   The pain medication prescribed to Plaintiff by his surgeon was to help alleviate the significant pain.

54.   Plaintiff informed Ms. Allen that he was not able to remember much due to the inhibiting medication and his post-surgery pain.

55.   Despite Plaintiff's cautionary warnings that he was not in a physical or mental state to coherently answer her questions at that time, Ms. Allen was persistent in continuing to ask Plaintiff questions.

56.   Ms. Allen completely disregarded the fact that Plaintiff was on an approved FMLA leave of absence, that he had just endured a knee replacement surgery, and that he was taking powerful pain medication.

57.   Upon information and belief, Ms. Allen contacted Plaintiff at least two additional times while Plaintiff was on FMLA and recovering from his surgery.

58.   Upon information and belief, Ms. Allen called Plaintiff on June 2, 2022 and June 7, 2022.

59.   Plaintiff was still on his approved FMLA leave of absence from Defendants on June 2 and 7, 2022.

60.   Defendants' rules and regulations precluded Defendants from contacting and interrogating Plaintiff while he was on his approved FMLA leave of absence.

61.   Plaintiff was called on multiple occasions by his supervisor Claudia N. during his FMLA leave of absence.

62.   During those occasions, Claudia N. strongly requested that Plaintiff return to work earlier than the time that has been approved for his FMLA leave of absence.

63.   Claudia N. told Plaintiff that Defendants needed Plaintiff to return before the end of his FMLA leave of absence because they were short of staff.

64.   Plaintiff was also called on multiple occasions by his Claudia N.'s supervisor, Patrick B., during Plaintiff's FMLA leave of absence.

65.   During those occasions, Patrick B. strongly requested that Plaintiff return to work earlier than the time that has been approved for his FMLA leave of absence.

66.   Patrick B. even went to the extreme measure of visiting Plaintiff's house in-person and insisting that Plaintiff come back to work before the end of his approved FMLA leave of absence.

67.   Plaintiff was under his approved FMLA leave of absence when Patrick B. came to his house and requested Plaintiff come back early.

68.  On August 1, 2022, Plaintiff returned to work after approximately 10 weeks of being off work on his approved FMLA leave of absence due to his surgery.

69.  On or about August 3, 2022, Plaintiff department Manager Joe and Plaintiff's Director Patrick B. called Plaintiff into their office to inform Plaintiff that he had received a Note to File when he was off on FMLA leave.

70.  Joe and Patrick B. told Plaintiff that they would get it taken off Plaintiff's file, knowing the situation of his FMLA and about Plaintiff being called while on medication and recovering from surgery.

71.  Patrick B. later reassured Plaintiff shortly thereafter that the Note was in fact taken care of and had been removed from Plaintiff's file.

72.  However, upon information and belief, this "Note" was not taken out of Plaintiff's file as promised by Plaintiff's managers.

73.  In or about November 2022, Defendants' slots team got the okay to hire five more Assistant Shift Managers, which were for the same position as held by Plaintiff.

74.  Defendants proceeded to hire the additional assistant shift managers.

75.  These new assistant shift managers were younger than Plaintiff.

76.  Plaintiff was requested to train the new assistant shift managers.

77.  Plaintiff proceeded to train the new assistant shift managers.

78.   After returning back from his knee replacement surgery, it became increasing

clear that Plaintiff needed to have his other knee replaced.

79.   During the late winter of 2023, Plaintiff submitted to Defendants a request for

FMLA leave of absence to have his other knee replaced.

80.   In a letter dated March 28, 2023, Defendants informed Plaintiff that his

request for FMLA leave had been approved.

81.   A genuine copy of the letter sent by Defendants to Plaintiff dated March 28,

2023 is attached hereto as **Exhibit 1**.

82.   Defendants' March 28, 2023 letter to Plaintiff approved Plaintiff for an FMLA

leave of absence for his second knee replacement for the period 3/21/2023

through 03/21/2024.

83.   On Friday, April 7, 2023, Plaintiff received a voicemail on his day off work

from his immediate boss, Chris Suchomel.

84.   Plaintiff returned Mr. Suchomel's phone call.

85.   During the call, Mr. Suchomel informed Plaintiff that he was being placed on

Suspension - Pending Investigation.

86.   Mr. Suchomel sent Plaintiff the Suspension Notice document, a genuine copy

of which is attached hereto as **Exhibit 2**.

87.    On April 11, 2023, Plaintiff had a phone discussion with Mark Lights –
       Defendants' VP of Slot and Table Operations; Sarah Yeaton of Defendants'
       Human Resources Department, plus another African American female from
       Defendants' Human Resources Department.

88.    Plaintiff was harassed and interrogated during the call on irrelevant subjects.

89.    Plaintiff asked during the phone call if anyone reviewed any video related to
       any of the subjects that Plaintiff was asked about.

90.    Defendants' representatives on the phone did not indicate to Plaintiff that they
       reviewed any of the videos relating to the subjects.

91.    On April 14, 2023, Mark Lights, Vice President of Defendants, called
       Plaintiff.

92.    Mr. Lights told Plaintiff that Defendants were terminating Plaintiff's
       employment.

93.    Defendants stated that Plaintiff was being terminated for the newly raised
       issued and for the statements Plaintiff made to Ms. Allen when he was on
       FMLA leave of absence.

94.    Plaintiff told Mr. Lights that his bosses told him that the 2022 Note was taken
       out of his file.

95.   Plaintiff also asked Mr. Lights if Defendants checked the videos related to the newly alleged incident.

96.   Mr. Lights responded that Defendants did not review the videos related to the newly alleged incident.

97.   Mr. Lights confided to Plaintiff that Defendants' actions in terminating Plaintiff were due to Plaintiff taking of an FMLA leave and Plaintiff requesting to go on another FMLA leave, as well as because of Plaintiff's participation in Defendants' investigation of R.A.

98.   Mr. Lights further suggested to Plaintiff that Defendants' Human Resources ultimately made the decision and that he did not agree with it and believe it was appropriate and that Plaintiff should go the legal route (i.e. to hire a lawyer and bring a lawsuit).

99.   Defendants sent a letter to Plaintiff dated April 14, 2023 informing Plaintiff that his employment with Defendants was being terminated on April 14, 2023.

100.  A genuine copy of Defendants' letter of termination to Plaintiff is attached hereto as **Exhibit 3**.

101.  Defendants' purported reasons for terminating Plaintiff were unlawful, contrived, bogus, factually untrue and completely without merit.

102. Additionally, Defendants' purported reasons for terminating Plaintiff were a pretext for Defendants' true and real reason(s) for terminating Plaintiff, which was in retaliation for Plaintiff's participation in Defendants' investigation of R.A., for Plaintiff's taking an FMLA leave for his first knee replacement, for Plaintiff request to take a second FMLA leave of absence for his second knee replacement, for Plaintiff's age, and for Plaintiff being disabled or perceived by Defendants' as being disabled.

103. The above listed factors were the actual and motivating factors in Defendants' decision to terminate Plaintiff, all of which were illegal.

104. At all times during Plaintiff's employment with Defendants, Plaintiff was qualified for the position that he held with Defendants.

105. Defendants were predisposed to discriminate against Plaintiff because of he took and/or request FMLA leave, because of his age, because of his disability or perceived disability, and that Defendants acted on that predisposition by intentionally and wrongfully terminating Plaintiff.

106. As a result of Plaintiff being terminated unlawfully, Plaintiff has sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of job benefits, including insurance coverages, bonuses, 401k, etc., loss of career opportunities, humiliation and embarrassment, mental and

emotional distress, anxiety, indignation, depression, sleeplessness, weight change, loss of the ordinary pleasures of everyday life, inability socialize and enjoy his community, including the right to a gainful occupation of choice. Plaintiff is also entitled to additional compensatory, exemplary and/or punitive damages, and other consequential and incidental damages.

## COUNT 1

### VIOLATION OF THE FMLA - 29 U.S.C. 2601 et seq.
**(Discrimination, Harassment and Retaliation)**

107.    Plaintiff repeats and re-alleges the allegations set forth above.

108.    Plaintiff was an eligible employee within the meaning of the Family and Medical Leave Act (hereinafter "FMLA") as of the date(s) he requested time off for his knee replacement surgeries.

109.  Plaintiff was employed by Defendants for a time period greater than 12 months as of the date(s) he requested FMLA time as stated above.

110.During the aforementioned 12 months, Plaintiff worked greater than 1250 hours.

111.  Defendants were at all relevant times an employer within the meaning of the FMLA.

112.  Defendants, as explained in detail above, interfered with, restrained and denied Plaintiff's exercise and attempted exercise of his rights under the FMLA by

harassing him and retaliating against him for taking his approved FMLA leave and for his request to take an FMLA leave.

113. During Plaintiff's employment with Defendants, Plaintiff was subjected to different terms and conditions of employment, as compared to other similarly situated co-workers who were outside Plaintiff's protected class and due to his FMLA status.

114. Plaintiff's FMLA status was at least one factor that made a difference in Defendants' actions and employment decisions regarding Plaintiff, including but not limited to her termination.

115. If not for Plaintiff's FMLA protected activity, he would not have been discriminated against, harassed, retaliated against and ultimately terminated by Defendants.

116. There was a causal connection between Plaintiff's protected FMLA activity and Defendants' adverse employment actions against him.

117. Defendants' unlawful actions were willful, reckless and made in an intentional and deliberate disregard for Plaintiff's rights, especially that Defendants' knew that its conduct was prohibited by the FMLA.

118. As a direct and proximate result of Defendants' unlawful actions, Plaintiff has sustained injuries and damages including, but not limited to, loss of earnings

and earning capacity; loss of employment benefits; loss of career opportunities; humiliation and embarrassment; mental and emotional distress; anxiety, indignation, depression, sleeplessness, weight loss, and loss of the ordinary pleasures of everyday life, including the right to a gainful occupation of choice. Plaintiff is also entitled to additional compensatory, liquidated exemplary and/or punitive damages.

WHEREFORE, Plaintiff is entitled to and requests the following relief and judgment against Defendants:

a.    Compensatory damages in whatever amount Plaintiff is found to be entitled, including but not limited to past, present and future pain and suffering, physical, mental and emotional distress;

b.    Exemplary and/or punitive damages in whatever amount Plaintiff is found to be entitled;

c.    Judgment for lost wages, past and future, in whatever amount Plaintiff is found to be entitled;

d.    An award for the value of lost fringe, medical, pension and all other employment benefits, past and future;

e.     An order awarding the benefits to which Plaintiff (and her husband) were entitled to under the company's health and medical benefit plans;

f.     Liquidated damages equal to the amount of wages, salary, employment benefits, or other compensation denied or lost by reason of Defendants' violation of 29 USC 2617, plus interest;

g.     An award of common law and/or statutory interest, costs, and attorney fees;

h.     An injunction prohibiting any further acts of retaliation or discrimination; and

i.     Whatever other equitable relief appears appropriate at the time of final judgment, including reinstatement, promotion or employment.

## COUNT 2

### VIOLATION OF ELLIOTT-LARSEN CIVIL RIGHTS ACT - MCL 37.2101 ET SEQ.
### (Age Discrimination – Against All Defendants)

119.  Plaintiff repeats and re-alleges the allegations set forth above.

120.  At all times during his employment with Defendants, Plaintiff was qualified for the positions he held.

121. At all material times, Plaintiff was an employee and Defendants were his employer, covered by and within the meaning of the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq. (the "Act").

122. The Act prohibits an employer from discriminating against, discharging or retaliating against an employee on the basis of age.

123. As set forth above, Plaintiff suffered unlawful discrimination by Defendants on the basis of his age because a motivating factor in Defendants' decision to terminate Plaintiff was due to his age.

124. Plaintiff's age was a determining factor or one factor that made a difference in Defendants' decision to terminate Plaintiff.

125. Defendants' actions were also made in an intentional, willful and malicious disregard for Plaintiff's rights.

126. There is both direct evidence and circumstantial evidence that Defendants' decision to terminate Plaintiff was due, at least in part, to Plaintiff's age.

127. As a result of Plaintiff being terminated due to his age, Plaintiff has sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of job benefits, including insurance coverages, bonuses, 401k, etc., loss of career opportunities, humiliation and embarrassment, mental and emotional distress, anxiety, indignation, depression, sleeplessness, weight change, loss of the

ordinary pleasures of everyday life, inability  socialize and enjoy his community, including the right to a gainful occupation of choice.  Plaintiff is also entitled to additional compensatory, exemplary and/or punitive damages, and other consequential and incidental damages.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants, jointly and severally, as follows:

      a. Compensatory damages in whatever amount Plaintiff is found to be entitled including but not limited to past, present and future pain and suffering, physical, mental and emotional distress related damages;

      b. Exemplary and/or punitive damages in whatever amount Plaintiff is found to be entitled;

      c. Economic damages, including for lost wages and fringe and pension benefits, past and future, bonus payments, in whatever amount Plaintiff is found to be entitled;

      d. An award of interest, costs, and reasonable attorney fees;

      e. An injunction prohibiting any further acts of retaliation or discrimination by Defendants; and

    f.  Whatever other equitable relief appears appropriate at the time of final judgment, including reinstatement.

## COUNT 3

## VIOLATION OF MICHIGAN'S PERSON'S WTH DISABILITIES CIVIL RIGHTS ACT

128. Plaintiff repeats and re-alleges the allegations as set forth above.

129. Michigan's Persons with Disabilities Civil Act ("PWDCRA") makes it unlawful for an employer to discriminate against an individual because of a disability that is unrelated to the individual's ability to perform the particular job or position. More specifically, an employer may not discriminate in hiring, recruiting, promoting, or discharging, or with respect to compensation, terms, conditions, or privileges of employment.

130. An employer is also prohibited from limiting, segregating, or classifying an employee or applicant for employment in a way that deprives the individual of employment opportunities because of their disability if the disability is unrelated to the person's ability to perform the duties of the particular job or position.

131. Plaintiff has a disability as defined under the PWDCRA due to his need for knee replacements.

132. Plaintiff notified Defendants of the need for an accommodation.

133. Defendants failed to provide the requested accommodation.

134. Defendants took an adverse employment action against Plaintiff by terminating Plaintiff because of his disability.

135. Plaintiff's disability was unrelated to his ability to perform the job.

136. Defendants discriminated against Plaintiff in their job application procedures, their hiring/non-hiring of Plaintiff, Plaintiff's advancement, and/or Plaintiff's discharge, Plaintiff's compensation, job training, and other terms, conditions, and privileges of employment, all because Plaintiff has a disability.

137. Additionally, Defendants unlawfully perceived Plaintiff as being disabled.

138. Plaintiff has suffered damages as a result of Defendants' unlawful actions.

139. As a result of Defendants' violations of the PWDCRA, Plaintiff has sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of job benefits, loss of career opportunities, humiliation and embarrassment, mental and emotional distress, anxiety, indignation, depression, sleeplessness, loss of the ordinary pleasures of everyday life, inability to socialize and enjoy his community, including the right to a gainful occupation of choice. Plaintiff is also entitled to additional compensatory, exemplary and/or punitive damages, and other consequential and incidental damages.

**WHEREFORE,** Plaintiff requests that this Court enter judgment against Defendants jointly and severally as follows:

    a) Compensatory damages in whatever amount Plaintiff is found to be entitled including, but not limited to past, present and future pain and suffering, physical, mental and emotional distress;

    b) Exemplary and/or punitive damages in whatever amount Plaintiff is found to be entitled;

    c) Judgment for economic damages, including for lost wages and fringe and pension benefits, as well as for all past and future economic damages, in whatever amount Plaintiff is found to be entitled;

    d) An award of interest, costs, and attorney fees;

    e) An injunction prohibiting any further unlawful acts; and

    f) Whatever other equitable relief appears appropriate at the time of final judgment, including reinstatement.

Respectfully submitted,

*/s/  Thomas R. Warnicke*
Thomas R. Warnicke (P47148)
Attorneys for Plaintiff
Law Offices of Thomas R. Warnicke, PLLC
30200 Telegraph Road, Suite 102
Bingham Farms, MI 48025
(248) 930-4411
tom@warnickelaw.com

**<u>JURY DEMAND</u>**

Plaintiff hereby demands a jury trial in this action.

Respectfully submitted,

*/s/  Thomas R. Warnicke*
Thomas R. Warnicke (P47148)
Attorneys for Plaintiff
Law Offices of Thomas R. Warnicke, PLLC
30200 Telegraph Road, Suite 102
Bingham Farms, MI 48025
(248) 930-4411
tom@warnickelaw.com

# EXHIBIT 1

016-MGM Grand Detroit, LLC                                                  21901267

 **MGM RESORTS** INTERNATIONAL®

**HR SHARED SERVICES**
(855) 464-6747 | mymgm.com

03/28/2023

Souhil Chaghouri
7212 Stonebrook Rd
West Bloomfield, Michigan 48322

Re:  21901267

Dear Souhil Chaghouri:

This letter is to inform you that your request for intermittent leave under the Family Medical Leave Act (FMLA) has been approved.  Your leave is approved effective 03/21/2023 through 03/21/2024.

**Current Available FMLA Leave Allotment**
According to our records, you currently have 16 hours of FMLA leave time available.  If you believe this is not accurate, please contact HR Shared Services.

**Approved Frequency and Duration of Intermittent Leave Episodes**
In accordance with the medical certification you have provided, your intermittent FMLA leave has been approved with the following frequency and duration for the anticipated episodes of incapacity or caregiver leave: for a frequency of 1 time a week for a duration of 1 day per episode.

**Managing Your FMLA Leave**
Your LOA Case 21901267 has been processed. To view case status and upload documents, log on to mymgm.com, click Check Case Status, then select 21901267.

Sincerely,
HR Shared Services

Log on to My MGM 24/7 from any device for tools and resources, current Company information, Employee Offers, and more.

016-MGM Grand Detroit, LLC                                      21901267

MGM Resorts International
Absence Management
980 Kelly Johnson Drive Suite 160
Las Vegas, NV 89119-3718


Souhil Chaghouri
7212 Stonebrook Rd
West Bloomfield, Michigan 48322

# EXHIBIT 2

## SUSPENSION PENDING INVESTIGATION NOTICE

EMPLOYEE NAME:     Souhil Chaghouri          EMPLOYEE #: 160005823

POSITION:  Slot Assistant Shift Manager

INCIDENT DATE:                          DATE ISSUED: 4/07/2023

You are being placed on Suspension Pending Investigation ("SPI") effective _4/07/2023_. This is not disciplinary action; it is a process that the Company utilizes to remove you from the workplace in order investigate a serious situation or policy infraction in which you may have been involved. It is also utilized if y have reached the final step in the progressive disciplinary process.

You will have the opportunity at a later date to attend an Investigational Meeting with an Employee Relatio Representative to discuss your Suspension Pending Investigation. At this time, you must leave proper Employee Relations will contact you to schedule your Investigative Meeting and you must make yourself read available for that meeting.

While on SPI, please understand that you are not permitted on property except to attend your meeting v Employee Relations. If you have any questions or have additional information regarding the investigation, ple contact Employee Relations at 725-256-7415.

Upon the completion of the investigation process, one of the following things will occur:

1. You will be returned to work without disciplinary action and compensated for the scheduled shifts mi resulting from the SPI. You will not be compensated for any shifts missed due to your unavailabili work; or

2. You will be returned to work with disciplinary action if warranted based on the outcome of investigation, and possibly no compensation; or

3. You will be separated from the Company if warranted based on the outcome of the investigation.

Your signature below acknowledges that you have read this document and that you understand it is n admission of guilt.

_Unavailable to sign_                  _4/7/23_        _248-227-8777_          _SHUUFSAM@ya_
Employee Signature                 Date            Phone Number            Email

_Christopher Suchomel_            _4/7/23_          _____294_
Supervisor Name (Please Print)    Date            Supervisor Signature

# EXHIBIT 3



04/14/2023

Souhil Chaghouri
7212 Stonebrook Rd
West Bloomfield, Michigan 48322

Dear Souhil Chaghouri,

The purpose of this letter is to inform you that your employment with MGM Grand Detroit, LLC is terminated effective 04/14/2023.

Attached is a Personnel Action Notice for your reference, detailing the reasons the company has moved forward with separation.

You are requested to return any company property in your possession as soon as possible.  Please contact your former department leader to arrange a time to process out.  Any wages owed to you will be direct deposited to your account on file in Workday.

A copy of this letter is also being emailed to the address on file to: SHUUFSAM@YAHOO.COM

Sincerely,

BILLYE POUNDS
Employee Relations Partner



# Separation PAN

Employee: Souhil Chaghouri
Effective Date: 04/14/2023
Last Day Worked: 04/14/2023
EE#: 160005823

Employer: MGM Grand Detroit, LLC
Company: MGM Resorts International
Department: Slots-Operations
Position: Assistant Shift Manager Slots
Employment Status: Full time

**Remarks:**

Separation for multiple violations of MGM Grand Detroit, LLC General Rules of Conduct including but not limited to:

Policy Against Discrimination, Harassment and Retaliation
A #4: Discriminating against or harassing anyone in violation of law, Company or Property policy, or both, including discrimination or harassment based on race, sex, or any other legally protected status (See MGM Grand Detroit's Policy Against Discrimination, Harassment, and Retaliation).
A #26: You have a duty to cooperate with any and all Company audits and investigations regarding suspected violations of Company policies. We expect you to cooperate fully and truthfully. You should never withhold or tamper with information in connecting with such an investigation or audit.